ALW, INC., a Nevada Corporation,
d/b/a Kings Castle Hotel and
Casino, Plaintiff-Appellant,

v.

UNITED AIR LINES, INC. and UAL,
Inc., Defendants-Appellees.

No. 73–1499.

United States Court of Appeals,
Ninth Circuit.

Jan. 20, 1975.

Richard C. Leonard (argued), Los Angeles, Cal., for plaintiff-appellant.

Alvin J. Rockwell (argued), of Brobeck, Phleger & Harrison, San Francisco, Cal., for defendants-appellees.

Before CHOY and SNEED, Circuit Judges, and BEEKS,* District Judge.

## OPINION

BEEKS, District Judge:

This is an appeal from an order of the district court granting summary judgment of dismissal. The complaint alleges violations of the federal antitrust laws and also contains allegations sounding in common law tort, breach of contract, or both. The court below accorded adequate treatment to the antitrust issues, but, finding the action to be "expressly predicated" on the antitrust laws, declined to discuss the common law claims.

Viewing the evidence adduced in the light most favorable to appellant, as we must, the facts may be summarized as follows. Appellant, ALW, Inc. d/b/a Kings Castle Hotel and Casino (hereinafter "K.C.") operates a resort hotel in the Reno-Lake Tahoe, Nevada area. Appellee,[1] United Air Lines, Inc. (hereinafter "United"), is one of several common carriers furnishing air service to Reno, but is the only scheduled airline operating a one-carrier service between

---

* The Honorable William T. Beeks, Senior United States District Judge for the Western District of Washington, sitting by designation.

1. Also named as a defendant in the complaint is UAL, Inc. of which United Air Lines, Inc. is

a wholly owned subsidiary. UAL, Inc. was dismissed from the action pursuant to an order dated January 7, 1972, and the purported service of the summons on UAL, Inc. was quashed.

Reno and the Eastern portion of the United States.[2]

In early 1970 K.C. and United engaged in discussions concerning the development of a joint promotional campaign, the purpose of which was to advertise K.C. and thereby increase travel (via United) to Reno-Lake Tahoe and the appellant hotel. In mid-1970 K.C. was approached by United with a request for information about the hotel and its facilities. This information was to be included in a special March, 1971 issue of United's "Mainliner" magazine[3] that was to feature promotional material on the State of Nevada. In cooperating with United, K.C. entertained, as its guests, the free lance writer and photographer assigned by United to prepare the article. K.C. was advised by various employees of United on several occasions that it could expect to receive favorable editorial comment in the feature issue. K.C. consequently reduced its advertising expenditures and entertainment schedule for the months during which it expected to reap the promotional benefits accruing from publication of the feature. K.C. specifically declined to purchase advertising space in the March, 1971 edition of Mainliner.

In the course of preparing the Nevada issue of Mainliner, several employees of United received information adverse to K.C. and its reputation in the Reno-Lake Tahoe community.

In any event, although the original draft of the article contained considerable praise of the K.C. hotel facility, the final version, as edited by United and published in the March, 1971 edition of Mainliner contained no mention of K.C. It did contain photographs of the facilities and personnel of K.C. that were not identified in text or caption as such. The text referred to the availability in the Reno-Lake Tahoe area of facilities and entertainment that actually are found only at K.C., but no credit was given to appellant. An inference might thus be drawn by one reading the article that these facilities and entertainment are found at other hotels mentioned by name in the feature.

On the basis of these events, K.C. brought this action on April 12, 1971, alleging jurisdiction based upon Section 4 of the Clayton Act,[4] and upon diversity of citizenship. The complaint alleged violations of Sections 1 and 2 of the Sherman Act,[5] and Section 3 of the Clayton Act.[6] The complaint also contained certain allegations that are apparently unrelated to the antitrust counts, and which might be construed as allegations of breach of contract, fraudulent misrepresentation, or both.

I.

K.C.'s claim under Section 1 of the Sherman Act rests upon its allegation that United conspired with unidentified parties to delete mention of K.C. in the March, 1971 Mainliner feature and thereby destroy the commercial value of the hotel. It has alleged the elements essential to maintenance of a cause of action under Section 1 of the Sherman Act: It has alleged (1) the existence of a contract, combination or conspiracy, (2) for the purpose of restraining a significant line of interstate commerce and (3) damage to its business or property arising from the antitrust violation. Yet the mere allegation of these elements, once they are rebutted is not sufficient to withstand a motion for summary judgment.[7]

---

2.  United enjoys this monopoly on service to Reno from the Eastern United States by virtue of the regulatory actions of the Civil Aeronautics Board.

3.  Mainliner is a publication of United. It typically contains paid advertising and feature "editorials" that focus on items of interest to tourists. United provides a complimentary copy of Mainliner to each of its passengers by placing a copy in the pouch attached to the rear of each seat in its airliners.

4.  15 U.S.C. § 15.

5.  15 U.S.C. §§ 1, 2.

6.  15 U.S.C. § 14.

7.  First Nat. Bank v. Cities Service Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

■ We are mindful that summary judgment is not typically a favored course in antitrust litigation.[8] Yet, even within this specialized realm that so frequently presents issues of law and of fact that are inextricably entwined, the procedures set forth in Fed.R.Civ.P. 56 retain their utility under circumstances such as those present here. Once the allegations of conspiracy made in the complaint are rebutted by probative evidence supporting an alternative interpretation of a defendant's conduct, if the plaintiff then fails to come forward with specific factual support of its allegations of conspiracy, summary judgment for the defendant becomes proper.[9]

United has, in response to interrogatories, denied any conspiratorial conduct. United maintains that it exercised its discretion as the publisher of Mainliner in making a unilateral decision, albeit based on information received from others, to delete references to K.C. from Mainliner's coverage of the Reno-Lake Tahoe area. K.C., although having made full use of the discovery process, is nonetheless unable to specify the names of, or otherwise identify, the parties to any conspiracy,[10] the substance of any conspiratorial agreement or the motive therefor.

Fed.R.Civ.P. 56(e) requires opposing affidavits that "set forth such facts as would be admissible in evidence, and . . . [that] show affirmatively that the affiant is competent to testify to the matters stated therein." First Nat. Bank v. Cities Service Co.,[11] expressly rejected the contention that

" . . . Rule 56(e) should, in effect, be read out of antitrust cases . . . [permitting] plaintiffs to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations . . . While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint." [12]

■ This holding is apposite here. The district court was correct in summarily dismissing the alleged violation of Section 1 of the Sherman Act.

## II.

Appellant's cause of action under Section 2 of the Sherman Act also suffers from deficiencies of factual support that ultimately, and properly proved fatal when subjected to the test of the motion for summary judgment. K.C.'s theory under Section 2 is that United used its CAB-authorized monopoly on air travel to Reno-Lake Tahoe from the Eastern United States for the improper purpose of gaining a concurrent monopoly on tourist display advertising available to all United passengers and to persons traveling by air to Reno-Lake Tahoe from the Eastern United States.

■■ To sustain a cause of action for monopolization under Section 2 an injury resulting from an acquisition of monopoly power must be shown. Monopoly power has been defined as the power to control prices or exclude competition in the relevant market.[13]

---

**8.** *See,* Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962).

**9.** First Nat. Bank v. Cities Service Co., *supra* note 7.

**10.** Co-conspirators are not named in the complaint. K.C.'s responses to interrogatories do no more than suggest its suspicion of possible links between United and other Reno-Lake Tahoe hotels, the Reno Chamber of Commerce, and UAL, Inc., owner of Western International Hotels and a potential entrant into the competitive Reno-Lake Tahoe resort business.

**11.** *Supra* note 7.

**12.** 391 U.S. at 289–290, 88 S.Ct. at 1593.

**13.** *See,* United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

K.C. is inconsistent in its attempts to define the relevant market within which United's alleged monopoly power has been acquired. At one point it is claimed that United "monopolized . . interstate and foreign commerce in printed display advertising and editorial material distributed to persons who travel by air from the Eastern portion of the United States to the Reno-Lake Tahoe area, and all of defendant UNITED'S passengers." Elsewhere in the complaint it is alleged that United's route structure creates a monopoly "in the market for public relations and advertising addressed to air travelers and potential air travelers from the Eastern portion of the United States to the Reno-Lake Tahoe area . . . ." The first statement of the relevant market would seemingly limit that market to the peculiar niche occupied by Mainliner. The second statement is apparently of broader scope since there is a considerable volume of public relations and advertising material addressed to residents of the Eastern United States who potentially might travel by air at some time to the Reno-Lake Tahoe area.

We reject K.C.'s contention that the relevant market consists of and is limited to printed display advertising and editorial material that has the specific circulation of Mainliner magazine. In considering what is the relevant market for determining the control of price and competition, the Supreme Court has observed that "no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce,' monopolization of which may be illegal." [14] In Bushie v. Stenocord Corporation,[15] this court noted that

"[a] single manufacturer's products might be found to comprise, by themselves, a relevant market for the pur-

poses of a monopolization claim, if they are so unique or so dominant in the market in which they compete that any action by the manufacturer to increase his control over his product virtually assures that competition in the market will be destroyed."

As did the plaintiff in *Bushie,* K.C. here seeks to define the relevant market by excluding competitors marketing products similar to that of defendant. Undisputed evidence establishes that United carries aboard its aircraft numerous publications containing printed display advertising and editorial material, and that these publications are made available to its passengers.

While we need not determine the precise scope of the relevant market within which Mainliner magazine competes for the advertising dollar, even if we limit our attention to the segment of that market represented by publications carried aboard aircraft of United, it becomes clear that K.C. has failed to provide any factual support whatever for a contention that United has the power to control prices or restrict competition within that segment of the market.

K.C.'s contention that the combination of United's route system and its publication of Mainliner amount to an attempt at monopolization as proscribed by Section 2 fails for a similar reason. K.C.'s failure to make any showing whatever with regard to any power United might have to control prices or exclude competition from the relevant market not only precludes a finding of monopoly; it also precludes, on the basis of the record before us, any support for the inference that there exists a dangerous probability that a monopoly will be achieved.[16] K.C.'s allegations of an attempt to monopolize must also fail because of the total absence of any indication that United's publication and control of Main-

14.  United States v. E. I. DuPont de Nemours & Co., 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956).

15.  460 F.2d 116, 121 (9th Cir. 1972). *See also,* Syracuse Broadcasting Corp. v. Newhouse, 236 F.2d 522 (2nd Cir. 1956).

16.  *Cf.,* American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).

liner was inspired by a monopolistic purpose or intent.

It might further be observed that even if monopoly power were found to be present, K.C. has not alleged that this power worked to deprive it of exposure within any relevant market. K.C. was not denied the opportunity to advertise in Mainliner: indeed, it was encouraged yet declined to do so.

■ Thus, the evidence presented to the district court did not support a cause of action under Section 2: no monopoly power or dangerous probability thereof was shown to exist within any relevant market,[17] and no monopolistic intent is indicated. In the absence of factual support, general allegations of monopoly or attempted monopoly do not suffice to withstand a motion for summary judgment.[18]

### III.

■ K.C. alleges that free editorial comment in Mainliner is denied to those who do not purchase advertising space in the publication. This is claimed to be a tying arrangement, as prohibited by Section 3 of the Clayton Act.[19] This section makes it unlawful for a person engaged in commerce to lease or sell "goods, wares, merchandise, machinery, supplies, or other commodities," if the lease or sale, price, discount or rebate is conditioned on an agreement that the lessee or purchaser "shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor . . ." where the effect of the lease, sale, or condition would be substantially to lessen competition or tend to create a monopoly in any line of commerce.

Advertising does not fall within the traditional definition of "commodities"

within the purview of Section 3.[20] Even if we assume the contrary and the facts alleged by K.C. were to show conclusively that United predicated laudatory editorial comment in Mainliner upon the purchase of advertising space, this would not constitute a violation of the statute. That is, editorial comment is not conditioned on an agreement not to use the advertising space of competing publications. This demonstrates that United's control of the tying product, Mainliner editorials, is not sufficient to restrain competition in the market for advertising space, the tied product.

The district court concluded that assuming K.C.'s allegations to be true, United was nevertheless entitled to summary judgment as a matter of law. We agree.

### IV.

The complaint contains, in at least a rudimentary form, certain factual allegations that could form the basis for common law liability in the nature of breach of contract, fraudulent misrepresentation, or both.

In granting summary judgment for United, the trial court chose not to deal at length with the common law allegations:

> "This action . . . is expressly predicated upon [the antitrust laws]. While diversity of citizenship is alleged and admitted, as well as the jurisdictional amount, no effort has been made in pleading, briefing or argument to sustain a cause of action on the basis of a common law or statutory tort or breach of contract. Plaintiff's target is exclusively the pot of gold of treble damages available under the antitrust laws.

Paragraphs 24 and 25 of the complaint appear to state (albeit not in the tradi-

**17.** *Cf.,* Bushie v. Stenocord Corporation, *supra* note 15; Daily Press, Inc. v. United Press International, 412 F.2d 126 (6th Cir.), cert. denied, 396 U.S. 990, 90 S.Ct. 480, 24 L.Ed.2d 453 (1969); Syracuse Broadcasting Corp. v. Newhouse, *supra* note 15.

**18.** First Nat. Bank v. Cities Service Co., *supra* note 7.

**19.** *Supra* note 6.

**20.** Columbia Broadcasting System, Inc. v. Amana Refrigeration, Inc., 295 F.2d 375 (7th Cir. 1961), cert. denied, 369 U.S. 812, 82 S.Ct. 689, 7 L.Ed.2d 612 (1962).

tional linear sequence) the existence of a contract between K.C. and United, whereby K.C. would assist United's employees in the preparation of the Mainliner feature, in return for the assurance that K.C. would receive favorable treatment in the feature. Alternatively these same paragraphs, buttressed by an affidavit filed later in the case, appear to state a representation by United that K.C. would receive favorable comment in the feature, and detrimental reliance by K.C. upon that representation.

The complaint manifests an effort to combine the pleading of antitrust and common law causes of action. The result is an obtuse and confusing document. Nevertheless, certain of the jurisdictional, factual, and remedial allegations indicate there may be more to K.C.'s case than an antitrust suit. K.C. was never required to separately state its common law claims or to provide a more definite statement with respect thereto.

Viewing the evidence as a whole and the inferences that can be drawn therefrom in the light most favorable to K.C., it cannot fairly be said that there are no genuine issues of material fact to be resolved at trial. Factual issues tendered include the possible existence of a contract for publication in Mainliner of an article favorable to K.C.; the nature of representations, if any, made by United to K.C. in respect to the article in Mainliner; possible acts of reliance on such representations; possible fraudulent intent by United; possible detriment to K.C.

We do not presume to comment here on the issue of actual common law liability. We observe only that the standards required to support summary judgment are clear. As stated in Consolidated Electric Co. v. United States,[21]

"[summary judgment] should be rendered, upon motion, only 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Fed.R.Civ.P. 56(c). If, viewing the evidence as a whole and the inferences which may be drawn therefrom in the light most favorable to the party opposing the motion, we can see that there is no genuine issue of fact, then the granting of a motion for summary judgment should be sustained."

These standards have not been met. Since the court below did not expressly deal with factual issues raised by the common law claims, it is our view that justice requires remand to the district court with instructions that appellant be given leave to amend its complaint to separately state its common law claims plainly, concisely and with specificity.

Accordingly, the judgment of the district court is affirmed as to the antitrust causes of action and the case is remanded to the district court for further proceedings in accordance herewith. The parties shall bear their respective costs.

---

21. 355 F.2d 437, 438 (9th Cir. 1966).