SUPERMARKET OF HOMES, INC., and Original Supermarket of Homes, Inc., Plaintiffs-Appellants,

v.

SAN FERNANDO VALLEY BOARD OF REALTORS, California Association of Realtors, National Association of Realtors, Defendants-Appellees.

SUPERMARKET OF HOMES, INC., Plaintiff-Counterclaim Defendant-Appellant,

v.

SAN FERNANDO VALLEY BOARD OF REALTORS, California Association of Realtors, National Association of Realtors, Defendants-Counterclaim Cross Claim-Appellees.

SUPERMARKET OF HOMES, INC., Bar W Properties, Gina W. Williams, Lawrence W. Williams, Plaintiffs-Cross Defendants-Appellants,

v.

SAN FERNANDO VALLEY BOARD OF REALTORS, INC., California Association of Realtors, National Association of Realtors, Chuck Lamb, Mondae Siegmeth, Sally Collum and Judy Trout, Defendants-Cross Plaintiffs-Appellees.

Nos. 83–6325, 84–6159 and 84–6190.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 6, 1985.

Decided April 15, 1986.

Stephen E. Haberfeld, Haberfeld & Perlberger, Malibu, Cal., for plaintiffs-appellants.

Moses Lasky, John E. Munter, Lasky, Haas, Cohler & Munter, San Francisco, Cal., for defendants-appellees.

Before GOODWIN, SCHROEDER and BOOCHEVER, Circuit Judges.

GOODWIN, Circuit Judge:

Plaintiff real estate entities sued the defendant trade association and others for monopolization, price fixing, group boycott and the other usual antitrust counts. Plaintiffs were met by denials and a counterclaim for copyright infringement for plaintiffs' unauthorized copying and selling of pages from the defendants' multiple listing book. The district court, after examining a stipulated statement of facts, voluminous documents, exhibits, and an imposing file of pleadings, entered summary judgment in favor of the Board of Realtors on the antitrust claims. After further proceedings, the court also entered summary judgment for the defendants on the counterclaim, and awarded damages. Plaintiffs appeal.

For the purposes of this appeal we will forbear needless description of the plaintiff and defendant entities which were named in the original pleadings but upon which nothing turns. The controversy at the end had boiled down to one between Gina and Lawrence Williams (Supermarket), who controlled the various plaintiff entities, and the San Fernando Valley Board of Realtors (the Board), a membership association of about ninety five per cent of the real estate business entities in the region of Southern California roughly described as the San Fernando Valley.

The dispute arose out of the desire of Supermarket to use the multiple listing information compiled by the defendant Board without complying with the Board's multiple listing service rules. The Supermarket plan was to offer discount real estate service by charging sellers a flat fee for completed sales and by offering buyers a discount off the sale price.

Other Board members were accustomed to charging a "going rate" commission of six per cent of the ultimate sale price. The usual multiple listing sale involved the sale by a cooperating broker who was typically not the broker who had obtained the listing from the seller. In such cases, the two cooperating brokers would split the six per cent commission equally. When a property was listed in the Board's multiple listing book, as most properties were, any member of the Board, including Mrs. Williams, could become a cooperating broker by showing the property to a customer. If the customer thereafter bought the property, the selling broker and the listing broker would split the customary commission. This practice made no provision for the sort of business Supermarket desired to conduct.

Board members refrained from showing Supermarket listed properties for the rea-

son that there was little or no economic incentive for them to do so. Supermarket regarded this lack of response to its plan as a boycott in violation of the antitrust laws. Other members of the Board apparently regarded Supermarket's efforts as merely another economically doomed innovation that would be a mild irritant for awhile, but which would have no substantial impact on the way other Board members were conducting their business. The matter became a subject of newspaper attention and resulted in acrimonious exchanges between the parties. Supermarket decided to copy pages of the Board's multiple listing book and sell to their customers the copies Supermarket deemed relevant. Mrs. Williams is a member of the Board but does not consider herself bound by its rules.

The Board limits access to the multiple listing books in several respects. First, only licensed brokers may list properties in the book. Second, only licensed brokers receive copies of the book. Third, a broker may use the listing only by showing it to a customer in the broker's presence. Fourth, a broker may not sell or distribute copies.

The Board's copyright infringement counterclaim stems from Supermarket's public sale of multiple listing documents in defiance of the copyright notice contained in each document and in defiance of the Board's explicit prohibition.

Supermarket notified the Board of its intention to sell copies of multiple listings to the public, recognized that such a sale would be a "technical violation" of the Board's copyright and requested either outright permission or a licensing arrangement.

The Board refused Supermarket permission to disseminate multiple listing materials except as provided in the rules and warned that it would seek damages for any infringement. Supermarket nonetheless sold as many as 672 issues of the copyright material.

Supermarket contends on appeal that there were material issues of fact requiring a trial. The Board questions whether Supermarket had standing to file its antitrust complaint, whether it sustained any injury, and, if it did, whether that injury was caused by any act of the Board.

## STANDING

■ Standing to bring a private antitrust action is based upon § 4 of the Clayton Act, 15 U.S.C. § 15 (1982). *California Computer Products, Inc. v. International Business Machines Corp.*, 613 F.2d 727, 732 (9th Cir.1979). Plaintiff must show injury to his business or property by reason of "anything forbidden in the antitrust laws ....", 15 U.S.C. § 15 (1982), and that the injury is one against which the antitrust laws were designed to protect. *Kapp v. National Football League*, 586 F.2d 644, 648 (9th Cir.1978), *cert. denied*, 441 U.S. 907, 99 S.Ct. 1996, 60 L.Ed.2d 375 (1979).

■ Section 4 is to be applied according to its plain language and its broad remedial and deterrent objectives. *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 472, 102 S.Ct. 2540, 2544-45, 73 L.Ed.2d 149 (1982). It is broadly phrased. Congress intended to create a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions, and would provide ample compensation to the victims of antitrust violations. *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 472, 102 S.Ct. 2540, 2544-45, 73 L.Ed.2d 149 (1982). We are satisfied that Supermarket has standing.

## THE SECTION TWO ALLEGATIONS

Supermarket alleges that the Board monopolized and attempted to monopolize the San Fernando Valley real estate market in violation of § 2 of the Sherman Act, 15 U.S.C. § 2 (1982).

■ Monopoly power is the power to control prices or to exclude competition. *California Computer Products, Inc. v. International Business Machines Corp.*, 613 F.2d 727, 735 (9th Cir.1979). Monopolization has three elements. A plaintiff must prove that the defendant has monopoly power in the relevant market, that the de-

fendant willfully acquired or maintained that power, and that the plaintiff sustained antitrust injury. *Transamerica Computer Co., Inc. v. International Business Machines Corp.*, 698 F.2d 1377, 1382 (9th Cir.), *cert. denied*, 464 U.S. 955, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983).

Attempt to monopolize has four elements. It requires specific intent to control prices or to destroy competition, predatory or anticompetitive conduct directed to accomplishing that end, a dangerous probability of success, and causal antitrust injury. *Id.* Conduct that does not constitute willful acquisition or maintenance for the purposes of a monopolization charge cannot be cast as predatory for the purposes of an attempted monopolization charge against the same defendant. *Id.*

Supermarket's § 2 claim turns upon its allegation that the Board used various exclusionary practices to keep licensed brokers from entering the San Fernando Valley real estate market.

Supermarket's proferred documents failed to show that the Board's practices were intended to, or did restrict the entry of licensed brokers into the market for brokerage services. The Board apparently welcomes all licensed brokers who are willing to join and to abide by the rules of membership. Supermarket was never excluded from membership or participation. As noted, Mrs. Williams was a Board member fully entitled to use the multiple listing service. The Court correctly found no triable issue of fact on the monopolization and attempt to monopolize claim.

### THE SECTION ONE ALLEGATIONS

Supermarket alleges three violations of section 1 of the Sherman Act: price fixing; group boycott; and conspiracy in restraint of trade.

Price fixing is a per se violation of § 1 of the Sherman Act. *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 8, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1 (1979). For a pricing policy to violate § 1, it must result from an illegal agreement. *United States v. Miller*, 771 F.2d 1219, 1240 (9th Cir.1985). The agreement may be explicit or implicit.

Parallel pricing does not constitute price fixing. When the pricing behavior cannot be explained as being in the participants' self-interest, however, parallel pricing may evidence an illegal agreement. *Wilcox Development Co. v. First Interstate Bank of Oregon*, 605 F.Supp. 592, 594 (D.Or.1985).

Some horizontal group boycotts, that is, boycotts between competitors, are per se violations of § 1. *Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212, 79 S.Ct. 705, 709, 3 L.Ed.2d 741 (1959); *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 290 (9th Cir.), *cert. denied*, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980). Before we apply the per se rule, however, a plaintiff must show that the challenged activity "falls into a category likely to have predominantly anticompetitive effects." *See Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*, — U.S. —, 105 S.Ct. 2613, 2621, 86 L.Ed.2d 202 (1985). However, the unilateral refusal by one trader to deal with another is not a group boycott. An agreement, some concerted effort, is required before a group boycott exists. *Fine v. Barry and Enright Productions*, 731 F.2d 1394, 1398 (9th Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 248, 83 L.Ed.2d 186 (1984).

A conspiracy to restrain trade also violates § 1. Conduct not deemed a per se violation of § 1 is analyzed under the rule of reason, which asks whether there is an agreement among two or more persons or distinct business entities, the intent of which is to to harm or unreasonably restrain competition. The threatened harm must be to the competitive process, and not just to the plaintiff's business. *Kaplan v. Burroughs Corp.*, 611 F.2d at 290.

Proof that defendant's activities had an impact upon competition in the relevant market is "an absolutely essential element of the rule of reason case." *Calcula-*

*tors Hawaii, Inc. v. Brandt, Inc.*, 724 F.2d 1332, 1338 (9th Cir.1983) (quoting *Kaplan v. Burroughs Corp.*, 611 F.2d at 291).

### 1. Supermarket's Proof.

Supermarket relies on the following conduct to prove a price fixing conspiracy:

a. The Board's publications flagged Supermarket properties by showing Supermarket's discount commission, thereby facilitating avoidance of those properties by brokers.

b. The Board's executive vice-president made a speech in which he said that it was not unlawful for a real estate broker to select properties to show based upon remuneration.

c. The Board distributed an article printed in the state association's magazine stating that a realtor need not show property when the commission rate is too low to provide sufficient payment.

d. The National Association of Realtors published its stated policy that it was poor business for a listing agent to offer low commissions to cooperating agents.

e. The Board distributed state and national trade journals reporting a study which showed that a broker charging less than five to six percent commission would not make a profit.

f. The Board brought disciplinary proceedings against Gina Williams for giving names of certain brokers to the media, and for making public a residential property address without the listing broker's permission.

g. The Board caused or countenanced interference with Supermarket's attempt to advertise in newspapers.

h. The Board refused to run a Supermarket ad in its own newspaper.

Supermarket also alleged acts by individual brokers as evidence of a conspiracy to boycott:

a. Individuals contacted Supermarket's customers and told them that their properties would not be shown as long as they remained listed with Supermarket.

b. Individual brokers told real estate purchasers that discount brokers were "no good, unethical, worthless and of generally bad repute."

c. Individual brokers encouraged Supermarket real estate sellers to break their listing agreement with Supermarket. Supermarket states that about sixty-seven percent of its sellers cancelled their listing contracts because of the above alleged actions by individual brokers.

Supermarket alleges that the Board's access rule, which prevents the public from utilizing multiple listing in the absence of a broker, and Supermarket's inability to obtain satisfactory newspaper advertising, prevented the public from learning about discount services by means of general advertisement.

The "steering" by individual brokers, which consists of showing other properties and failing to show Supermarket properties, making disparaging remarks about discount brokers, refusing to show discount properties, and telling customers interested in a discount property that it had been taken off the market, prevents the public from learning about Supermarket in the one way that is easy and efficient, through the multiple listing service. Supermarket then reasons that because the public has no way of knowing about Supermarket's discount services, those services remain unused. This lack of business results in the absence of price competition, as well as a boycott, and fixes commissions at their six percent level.

### 2. The Board's Defenses.

To Supermarket's complaint of the Board's rejection of Supermarket's advertising, the Board answered that it ran one ad and would have run the only other one tendered if Supermarket had changed some misleading wording. This was not contradicted.

To the complaint about the Board's instigation of disciplinary proceedings against Mrs. Williams, the Board replied that although complaints were filed the Board did

not hold a hearing, did not make a finding, and in effect, took no disciplinary action against Mrs. Williams. This was not contradicted.

The Board concedes that it brought injunction proceedings in state court to prevent Supermarket's public distribution of property matter (the multiple listing pages) and that it counterclaimed against Supermarket for copyright infringement.

The Board's executive vice-president admittedly commented on a radio broadcast that brokers may show properties on basis of remuneration.

The Board conceded its "flagging" of the commission on Supermarket listed properties, explaining that its computer program must be prepared to print rates.

The Board conceded that its involvement in compiling and distributing the multiple listing materials passively allowed cooperating brokers to identify discount listings and "steer" their clients away from them.

The Board conceded that some newspapers may have refused to run Supermarket ads, but denied that the Board was instrumental in that refusal. Supermarket offered no proof connecting the Board with the advertising claim.

3. The Legality of the Board's Conduct.

None of these concessions and none of the conduct charged against individual brokers add up to a conspiracy by the Board to restrain trade.

■ Price information published without "plus factors," which indicate an agreement, is judged under the rule of reason. If the exchange of price information constitutes reasonable business behavior the exchange is not an illegal agreement. In order to prevail, "plaintiff must demonstrate that the allegedly parallel acts were against each conspirator's self interest, that is, that the decision to act was not based on a good faith business judgment." *Zoslaw v. MCA Distributing Corp.*, 693 F.2d 870, 884 (9th Cir.1982), *cert. denied*, 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983). Plaintiff tendered no such showing in this case. The Board tendered evidence of good faith business reasons for its practices.

In the record in the district court, although Supermarket originally alleged a conspiracy of licensed brokers to stabilize commissions in the San Fernando Valley, it later conceded that the brokers acted in self interest in refusing to show "low commission" residential properties. Furthermore, Supermarket never offered any proof of meetings or communications through which brokers set prices.

In a recent case from another circuit, similar allegations of conspiracy were made against the realty board and a group of individual competitors of the plaintiff. While the claim was allowed to go to the jury against the individual competitors, the court held that there was no evidence tying the realty board to the alleged conspiracy. *See Park v. El Paso Board of Realtors*, 764 F.2d 1053, 1061 (5th Cir.1985).

■ The district court granted summary judgment for the Board on the group boycott charge because Supermarket possessed no substantial probative evidence of a conspiracy. Supermarket does attempt to import an established boycott conspiracy from the alleged price fixing conspiracy, but there was none to import. The trial court correctly disposed of the boycott claim.

■ The district court also found that the Board's access rule did not violate § 1 under a rule of reason analysis. First, the court noted that the restricted access actually had procompetitive effects on the market assisting listing and cooperating brokers conveniently to match properties with customers. Second, the court noted that the Board showed other good reasons for the access rule. It protects the listing agent's right to the agreed commission upon sale and it also protects the privacy and property of the residential real estate sellers against unwanted visitors. These conclusions are fully supported by the record.

We affirm the grant of summary judgment in favor of the Board on the antitrust claims.

## THE COPYRIGHT INFRINGEMENT COUNTERCLAIM

The district court granted summary judgment for the Board on its copyright infringement counterclaim. In so holding, it found that all issues of the multiple listing book published after July 1980 were protected under the 1976 Copyright Act because they were published prior to infringement. Although the books were distributed to licensed brokers only, they were distributed for the purpose of public display. Public display was accomplished. The publication requirement is thus satisfied. Because the books were protected under the 1976 Act, the Board was entitled to statutory damages under 17 U.S.C. § 504 (1982) unless Supermarket could raise an affirmative defense.

Supermarket attempted to raise two defenses: that the Board was guilty of "copyright misuse," a form of unclean hands; and that Supermarket's distribution was "fair use" under 17 U.S.C. § 107 (1982).

▆▆▆ The defense of unclean hands by virtue of copyright misuse prevents the copyright owner from asserting infringement and asking for damages when the infringement occurred by his dereliction of duty. *Tempo Music, Inc. v. Myers*, 407 F.2d 503, 507 (4th Cir.1969) (infringer requested list of copyrighted songs from owner which owner neglected to supply). Plaintiff's action will be dismissed under the theory of unclean hands if defendant establishes that plaintiff's evidence was false and that plaintiff was involved in a scheme to defraud the public. *See Buchanan Homes and Auto Supply Co., Inc. v. Firestone Tire and Rubber Co.*, 544 F.Supp. 242, 245 (D.S.C.1981). There was no evidence of fraud or misconduct here.

▆▆▆ As a defense to copyright infringement, Supermarket alleges that the Board misused its copyright and therefore the doctrine of unclean hands applies. As evidence of misuse of copyright, Supermarket cites alleged discriminatory actions against Supermarket. These actions allegedly consist of failure to register with the copyright office the multiple listing materials between 1974 and 1980. Supermarket alleges that the Board took steps to obtain a 1976 Act right to statutory damages only after Supermarket had started its discount business. Supermarket further alleges that the Board discriminated against Supermarket when it obtained a temporary restraining order to prevent distribution to the public, when it was common practice for member brokers to disclose and distribute the same materials. It also alleges that although the Board would sell only three copies of the listings to Supermarket, "on at least 50 occasions prior to the commencement of the discount program, the Board had sold Mrs. Williams more than three copies." Finally, it alleges that the Board sold copies of multiple listing materials to moving companies and that this constitutes differential treatment of Supermarket.

The district court found that Supermarket's claim of copyright misuse was without merit. We agree. None of the conduct alleged constitutes misuse by the Board of its copyrighted listings.

▆▆▆ The district court found that Supermarket's distribution of the multiple listing materials was not fair use and also granted summary judgment on that basis. Fair use is best understood as "a privilege in others than the owner of a copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner." *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303, 306 (2d Cir.1966), *cert. denied*, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967) (quoting Ball, *The Law of Copyright and Literary Property* 260 (1944). A common type of "fair use" is quotation of a passage in a book review.

The affirmative defense to infringement of fair use is codified at 17 U.S.C. § 107

(1982). Section 107 lists four nonexclusive factors to be evaluated by the court:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

Although Supermarket contends that its use of copyright materials was for informational purposes, Supermarket made the same commercial use of materials as the complying members of the Board did; it provided information on residential housing in the San Fernando Valley in order to sell houses and earn money.

■■■■ The second factor to consider is the nature of the copyrighted work. Use of purely informational material is more readily found to be fair than use of creative works. *Brewer v. Hustler Magazine, Inc.*, 749 F.2d 527, 529 (9th Cir.1984). The informational nature of multiple listing materials superficially favors a fair use finding as far as it goes. However, Supermarket copied the entire work verbatim. The fact that Supermarket at times distributed only the portions relevant to a particular customer's interest does not mitigate the infringement. The practice also cuts against Supermarket in assessing its conduct under the third factor: the amount and substantiality of the portion of the copyrighted work used. Generally, no more of a work may be taken than is necessary to make the accompanying comment understandable. *See Benny v. Loew's, Inc.*, 239 F.2d 532, 537 (9th Cir.1956), *aff'd*, 356 U.S. 43, 78 S.Ct. 667, 2 L.Ed.2d 583 (1958).

■■■■ The last factor to consider is the effect upon the potential value of the work on the market for it. When the use is of a commercial nature, harm to the copyright owner can be presumed. *Brewer v. Hustler Magazine, Inc.*, 749 F.2d at 529.

Here, Supermarket's use of the copyright material exactly paralleled the commercial use by the Board and its complying members. The material, as distributed by Supermarket, was identical to and a perfect substitute for the material as publicly displayed by Board members after they had paid for it and used it according to the rules. The district court correctly found that the challenged use was not fair use.

## STRIKING OF AFFIRMATIVE DEFENSES

The district court granted defendant's motion to strike certain of Supermarket's defenses. We review for abuse of discretion. *See Fox v. Taylor Diving & Salvage Co.*, 694 F.2d 1349, 1357 (5th Cir.1983).

In the order of October 23, 1980, the district court struck affirmative defenses numbers 13, 14, 15, 16, 18, 23, and 25 under Federal Rule of Civil Procedure 12(f) as being either immaterial, redundant, impertinent or scandalous.

■■■■ The trial court did not specify upon which ground each defense was struck. Thus, we must affirm if the district court would not have abused its discretion in striking each defense on any of the four grounds.

For example, defense number 25, that injunctive relief should not be given because of the alleged anticompetitive effects of the access rule, was struck. The injunction was denied. The question was no longer before the court. The district court did not abuse its discretion in finding this defense immaterial.

Defense number 23, that the copyright and contract counterclaims should have been submitted to arbitration under the Board's grievance procedure, was struck. The Board's grievance mechanism does not discuss arbitration of disputes between the Board and a member. Thus, the court did not abuse its discretion in finding the defense immaterial.

Defense number 18, that Mrs. Williams' contract with the Board was a contract of adhesion, was struck. Because the con-

tract was no longer before the court, this defense was immaterial.

Other defenses to the contract claim include number 16 (that contract was ambiguous and contradictory), number 13 (that the Board violated its implied duty of good faith and fair dealing), number 14 (that the Board waived its right to complain of copyright infringement by its inconsistent behavior) and number 15 (that the Board is estopped to complain of copyright infringement due to its own inconsistent behavior). It cannot be said that the trial court abused its discretion in finding that these defenses were immaterial when they applied to the contract counterclaim and redundant when they applied to the copyright counterclaim. The same allegations of inconsistent behavior are made out under the copyright misuse defense. There was no abuse of discretion.

### DENIAL OF A MOTION TO ALTER, AMEND, OR VACATE JUDGMENT

Federal Rule of Civil Procedure 60(b) allows post judgment motions to alter or amend a judgment. Rule 60(b) allows the court to grant relief from judgment because of any of a number of reasons, including mistake, fraud, newly discovered evidence, and "any other reason justifying relief from the operation of the judgment." Fed.R.Civ.P. 60(b)(6).

Although district courts have the power to vacate a judgment whenever appropriate to accomplish a just end, the courts generally require a showing of extraordinary circumstances. *United States v. Sparks,* 685 F.2d 1128, 1130 (9th Cir.1982); *Ashford v. Steuart,* 657 F.2d 1053, 1055 (9th Cir. 1981); *Corex Corp. v. United States,* 638 F.2d 119, 121 (9th Cir.1981).

A district court's denial of a Rule 60(b) motion is reviewable for abuse of discretion. *Plotkin v. Pacific Telephone and Telegraph Co.,* 688 F.2d 1291, 1292–93 (9th Cir.1983).

Although Supermarket lists the denial of its motion to vacate judgment as an issue presented, it fails to explain why the district court abused its discretion in denying the motion. The district court did not abuse its discretion. The assignment is frivolous.

We do not reach the Board's defense of res judicata based upon an adverse judgment against a plaintiff entity in state court proceedings arising out of the same general controversy, because we affirm the district court's summary judgment on the merits. On the preclusive effect of state antitrust litigation generally, see *Marrese v. American Academy of Orthopaedic Surgeons,* —— U.S. ——, 105 S.Ct. 1327, 84 L.Ed. 274 (1985).

AFFIRMED.